# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **INTERNATIONAL MARKET BRANDS,** | ) | |
| | ) | |
| **Plaintiff and** | ) | |
| **Counterclaim Defendant,** | ) | |
| | ) | |
| **v.** | ) | **Civ. No. 1:09-cv-81E** |
| | ) | |
| **MARTIN INTERNATIONAL** | ) | **Under Seal** |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendant and** | ) | |
| **Counterclaim Plaintiff,** | ) | |

| | | |
|---|---|---|
| **MARTIN INTERNATIONAL** | ) | |
| **CORPORATOIN,** | ) | |
| | ) | |
| **Third-Party Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **C.A. CURTZE, INC.,** | ) | |
| **JACOBSTEIN FOOD SERVICE, INC., and** | ) | |
| **NORTHERN FROZEN FOODS, INC. d/b/a** | ) | |
| **NORTHERN HASEROT,** | ) | |
| | ) | |
| **Third-Party Defendants,** | ) | |

## OPINION

Pending before the Court are Defendant and Third-Party Plaintiff's (Martin International

Corporation, hereinafter, "Martin") Motion for Summary Judgment on Count I (Federal

Trademark Infringement) of its Counterclaim against Plaintiff, International Market Brands

("IMB") [Martin's Motion for Summary Judgment at ECF No. 51] and Martin's Motion for

Summary Judgment on Count I (Federal Trademark Infringement) of its Third-Party Complaint

against C.A. Curtze, Inc., Jacobstein Food Service, Inc., and Northern Frozen Foods, Inc. d/b/a

Northern Haserot ("IMB Defendants") [Id.] Because IMB Defendants are owned by IMB and simply licensees of IMB, both Counts take into account the same set of facts and law, therefore, our review for both Motions for Summary Judgment will be handled in the same discussion.

On April 18, 2007, IMB filed a trademark application (U.S. App. Ser. No. 77/159,769) with the United States Patent and Trademark Office (USPTO) for the mark BLACK PEARL in connection with *fresh pork* and *frozen pork*. [Id. emphasis added.] On June 26, 2007, IMB received a letter from Martin stating that it owned BLACK PEARL marks in connection with *seafood* and that purchasers of IMB's pork products sold under the BLACK PEARL trademark might be confused as to the source or approval of those goods and requested that IMB cease all use of the BLACK PEARL mark and abandon the USPTO application. On April 14, 2008 Martin filed a notice of opposition against the USPTO application alleging that it owned various BLACK PEARL marks. [Id.]

On November 6, 2008 IMB filed another trademark application with USPTO for the mark BLACK PEARL PREMIUM & Design in connection with "fresh pork and frozen pork sold to institutional buyers and restaurants, not sold to grocery stores, food markets, and other retail establishments." [Id.] On April 3, 2009 Martin called IMB to notify IMB of its intention to file a lawsuit for trademark infringement against IMB in view of IMB's use and application for registration. [Id.]

On April 8, 2009 IMB filed its Complaint for Declaratory Judgment against Martin asking the Court to declare that IMB's use of the IMB Marks does not infringe the Martin Marks or otherwise constitute unfair competition. [Id.] On May 29, 2009 Martin filed its Answer to Complaint and Counterclaim and Third Party Complaint. On November 1, 2010 Martin filed its Motion for Summary Judgment leaving us to answer the question: Did Martin "cast its pearls

before swine"?[1]  For the reasons set forth below, Plaintiff's Motion for Summary Judgment on both counts will be granted.

**I. Standard of Review.**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).  In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505 (1986).

In reviewing the evidence, the court draws all reasonable inferences in favor of the non-moving party.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Huston v. Procter & Gamble Paper Prod. Corp., 568 F.3d 100, 104 (3d Cir. 2009) (citations omitted).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  See Anderson, 477 U.S. at 255; Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004); Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).  "Only disputes over facts that might affect the outcome of the suit under the governing

---

1 "Do not give what is holy to the dogs; nor cast your pearls before swine, lest they trample them under their feet, and turn and tear you to pieces."  Matthew 7:6.

law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 247-48 (1986). An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. See id. "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial'" Matsushita, 475 U.S. at 587; Huston, 568 F.3d at 104.

**II. Relevant Facts**.

Defendant and Third-Party Plaintiff, Martin, is a company founded in 1985 and headquartered in Boston, Massachusetts. Martin distributes high quality fresh and frozen seafood products under the trademark BLACK PEARL. [Martin International Corporation's Statement of Material Facts in Support of its Motion for Summary Judgment at ECF No. 56]. Martin has sold numerous types of seafood under the BLACK PEARL mark including farm-raised and wild salmon, scallops, arctic char, sablefish, mahi mahi, shrimp, sea trout, rainbow trout, and prawns. [Id.] Martin sells its BLACK PEARL seafood products to locations throughout the United States including establishments such as food markets and grocery stores, food distributors, restaurants, and other institutions that serve food. [Id.]

Martin holds six U.S. Trademark Registrations for BLACK PEARL for various seafood products. [Id.] All of Martin's Trademark Registrations contain the words BLACK PEARL. While all the Registrations are at issue because they contain the words BLACK PEARL, the two Martin Registrations that are noteworthy are: (1) Registration No. 2,221,109 for BLACK PEARL and design which was applied for on October 22, 1996 and issued on February 2, 1999. [Id.] This mark may be described as a drawing of a black pearl followed by the words "Black Pearl" in script flowing in a wave-like style intended to be suggestive of seafood. [IMB's

4

Response to Concise Statement of Material Facts at ECF No.74]; and (2) Registration No. 2,433,486 for BLACK PEARL in standard characters in International Class $29^2$ was applied for on March 4, 2000 and issued on March 6, 2001. The Registrations cover Class 29 Goods – "seafood products, namely, farm raised Atlantic salmon, sea scallops, bay scallops, farm raised artic [sic] char, farm raised mahi mahi, Maine pink shrimp, yellowfin tuna and swordfish." [Id.] Martin has continuously used the BLACK PEARL mark since 1992. [Martin International ECF Corporation's Statement of Material Facts in Support of its Motion for Summary Judgment at No.56]. The existence and legitimacy of the Martin Registrations are not contested.

Martin's seafood is packaged in boxes, which prominently display the BLACK PEARL trademark, the inner packaging of Martin's seafood products also prominently displays the BLACK PEARL trademark, Martin features the BLACK PEARL brand-name on its website, Martin provides brochures and point-of-sale information cards featuring BLACK PEARL to be displayed and made available to consumers purchasing Martin's seafood at retail establishments such as markets and grocery stores, Martin requires markets and grocery stores that buy and resell its seafood to use display tags that feature the BLACK PEARL trademark, Martin exhibits its BLACK PEARL branded seafood at annual trade shows, and Martin sends direct mail solicitations concerning its BLACK PEARL branded seafood to retailers, distributors, and restaurants. [Id.] In addition, to Martin's use of the BLACK PEARL trademark, restaurants will sometimes feature Martin's BLACK PEARL trademark in standard characters on their menus in connection with entrée descriptions that feature Martin's BLACK PEARL seafood. [Id.]

Defendant, IMB and Third-Party Defendants ("IMB Defendants") are under common

---

2 Class 29 is the meats and processed food classification for trademarks.

ownership and control. [Id.] IMB Defendants are distributors of a wide range of food products including pork and seafood and are licensees of IMB. [Id.] In fact, from May 2006 through October 2006, Curtze, Jacobstein, and Haserot, the IMB Defendants, bought Martin BLACK PEARL branded seafood and resold it to their customers. [Martin's International Corporation's Statement of Material Facts in Support of its Motion for Summary Judgment at ECF No.56]. Furthermore, IMB Defendants have sold Martin's BLACK PEARL branded seafood to the same customers that bought BLACK PEARL branded pork [Id.], though IMB contends this type of occurrence is rare.

IMB Defendants began selling pork under the BLACK PEARL trademark as early as 2005. [IMB Complaint Against Martin International Corporation at ECF No.1]. IMB Defendants sell their pork to food markets and grocery stores, restaurants, bars, taverns, pubs, saloons, pizza places, medical centers, nursing homes, retirement homes, country clubs, colleges, high schools, day schools, child care centers, summer camps, career centers, vocational and technical schools, organizations and clubs, The Salvation Army, college fraternities and sororities, churches, businesses, museums, convention centers, and gentlemen's clubs. [Martin International Corporation's Statement of Material Facts in Support of Its Motion for Summary Judgment at ECF No.56]. IMB also sells its BLACK PEARL pork to individuals related to the company. [Id.]

Customers may order BLACK PEARL branded pork from IMB Defendants in the following ways: (1) by placing an order with a sales representative in person; (2) by placing an order over the telephone; and (3) by placing an order electronically on their computer using a password protected site on the Internet or using proprietary software that is installed on the

6

customers' computer systems. [Id.] This last computer option features an order form that lists

the IMB products with the name BLACK PEARL (e.g., "Black Pearl Boneless Pork Chop")

without any design component present on the order form. [Id.] Invoices for BLACK PEARL

pork contain the name BLACK PEARL with no design component. [Id.] Numerous restaurants

feature IMB's BLACK PEARL trademark in standard characters on their menus in connection

with descriptions of pork entrees. [Id.]

**III. Legal Analysis.**

Martin is seeking summary judgment on the issue of whether IMB's use of the BLACK

PEARL trademark for pork infringes on Martin's Trademark Registrations for the use of the

BLACK PEARL trademark for seafood under 15 U.S.C. § 1114 ("Lanham Act"). Under this law

> (1) Any person who shall, without the consent of the registrant –
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
> (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

To establish a violation of Section 1114, Martin "must show that: (1) the mark is valid

and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the

mark is likely to create confusion concerning the origin of the goods or services." Freedom Card,

Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 470 (3d Cir. 2005). In this case elements one and

two are not disputed. Martin established registration for the BLACK PEARL design trademark

7

in 1996 and the BLACK PEARL word mark in 2001 and has continuously used the trademarks since that time. Rather, what is disputed in this case is whether the character and use of the Parties' BLACK PEARL trademarks are so similar so as to cause confusion as to the source sponsorship, or association of their products to the end-user. "To prove likelihood of confusion, plaintiffs must show that 'consumers viewing the mark would probably assume the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" Checkpoint Sys., Inc. v. Check Point Software Technologies, Inc., 269 F. 3d 270, 280 (3d Cir. 2001) (citing Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1229 (3d Cir. 1978)). "'The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion.'" Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 472 (3d Cir. 1994) (citing Interpace Corp. v. Lapp, Inc., 721 F. 2d 460, 462 (3d Cir. 1983)). Ordinarily, likelihood of confusion is a factual issue. Green v. Fornario, 486 F.3d 100, 106 (3d Cir. 2007) (citing A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 207 (3d. Cir. 2000).

The Third Circuit determines whether there is a likelihood of confusion by analyzing ten factors identified in Interpace Corp. v. Lapp, Inc., 721 F.2d 460 (3d Cir. 1983). Those factors are:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the mind of the

consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

Id. at 463.

The ten-factor Lapp test was developed as a guide and although all of the factors can be useful, the Lanham Act does not require that they be followed precisely so long as the relevant comparisons suggested by the test are made. See A&H Sportswear, 237 F.3d 198. Further, "[n]one of these factors is determinative in the likelihood of confusion analysis and each factor must be weighed and balanced one against the other." Sabinsa Corp. v. Creative Compounds, 609 F.3d 175, 182 (3d Cir. 2010) (quoting Checkpoint Sys., Inc. v. Check Point Software Technologies, Inc., 269 F.3d 270, 280 (3d Cir. 2001)). "[N]ot all factors must be given equal weight. The weight given to each factor in the overall picture, as well as the weighing for plaintiff or defendant, must be done on an individual fact-specific basis." Checkpoint, 269 F.3d at 280. Once a trademark owner demonstrates likelihood of confusion, it is entitled to injunctive relief. 15 U.S.C. § 1114(2) (1976). We will evaluate the facts of this case under the Lapp factors to determine if there is a likelihood of confusion for the consumers of BLACK PEARL products.

**A. The Parties Positions.**

In its pleadings, Martin emphasized the likelihood of confusion that the pork products would be produced by the same company as the seafood products due to the fact that there is no difference in the BLACK PEARL trademark in standard characters. Furthermore, Martin emphasized the fact that seafood and pork are meat products and occupy the "center-of-the-plate" in meals and, therefore, it would be likely one company would handle both products. Martin substantiated this assertion by pointing to the fact that seafood and pork are classified together by

9

government agencies and other entities. [Martin International Corporation's Statement of Material Facts in Support of Its Motion for Summary Judgment at ECF No.56.] Martin stated that seafood and pork can substitute for one another in recipes and serve as the protein portion of the dish. Martin was using this example to establish the close competitive relationship between seafood and pork to add to its argument that with a similarity in product and a similarity in trademark there is a likelihood of confusion. [Id.] Martin also asserts that grocery stores and supermarkets often advertise and display seafood and pork products in close proximity to one another. [Id.] Circular ads often show seafood items and pork items near one another and the frozen and fresh food cases have seafood and pork displayed next to one another. [Id.]

IMB claims there is no evidence of customers being confused because of both IMB and Martin using the word mark BLACK PEARL. [IMB's Response to Concise Statement of Material Facts ECF No.74.] Further, IMB cites to the fact of the unique nature of the design of each mark where there can be no confusion. IMB contends that IMB's Design Mark and Martin's Design Mark are entirely distinct. [Id.] IMB's Design Mark has three dominant components, a fair ribbon with five stars, a prize hog and the words "BLACK PEARL PREMIUM" written in block lettering. The Martin Design Mark is a black pearl followed by the words "Black Pearl" in script flowing in a wave-like style. [Id.] The IMB Design Mark is comprised of the colors red, blue, white and black. The Martin Design Mark is black and white [Id.] (See Appendix A)

IMB acknowledges it has a computer order system with the order form containing descriptions of the products with only the BLACK PEARL word mark as described by Martin. However, IMB only provides access to their computer order system software to customers with a

substantial purchase history who have previously ordered from a sales representative, therefore, the customers would have had substantial advertising contact with the full BLACK PEARL Premium design mark before its exposure to the order form or invoices with only the BLACK PEARL word mark. The advertising contact would assure the customer exposure to the design mark and not simply the word mark, therefore eliminating the likelihood of confusion. [Id.]

IMB asserts that it markets to a different customer base than Martin which, again, reduces the likelihood of confusion of purchasers of BLACK PEARL products. "The IMB Parties are engaged in the sale and distribution of a broad line of food and food-related products to a targeted customer base." [Id.] The IMB Parties sell to institutional customers, such as restaurants, professional food service providers, hospitals, nursing homes, and other entities that sell or provide prepared foods as part of their business. [Id.] IMB emphasizes that it does not sell or market to individuals or large supermarkets or traditional grocery stores and, thus, its customer contacts are owners and purchasing professionals who purchase food as part of their job duties making them more knowledgeable than the average person. [Id.] IMB uses its sales force to advertise and develop and maintain customer relationships which allows IMB to educate customers and potential customers of its products, thus eliminating any chance of confusion. [Id.]

### B. The Lapp Factors

### 1. The Degree of Similarity Between Martin's Mark and IMB's Mark.

#### *Directly Competing Products*

The Third Circuit court explains "[a]lthough the degree of similarity between the owner's mark and the alleged infringing mark is but one factor in the multi-factor confusion analysis, we

11

have recognized that when products directly compete, mark similarity 'may be the most important of the ten factors in *Lapp*.'" Checkpoint, 269 F.3d at 281 (quoting Fisons, 30 F.3d at 476). "The test for such similarity is whether the labels create the same overall impression when viewed separately." A&H Sportswear, 237 F.3d at 216 (internal quotations and citations omitted). In cases where products are directly competitive, this factor is treated as the most important of the Lapp Factors. See Checkpoint, 269 F.3d at 281. "Where the goods or services are not competing, the similarity of the marks is only one of a number of factors the court must examine to determine likelihood of confusion." Fisons, 30 F.3d at 473. Courts "compare appearance, sound, and meaning of the marks" to determine whether the "average consumer, on encountering one mark in isolated circumstances of [the] marketplace and having only [a] general recollection of the other, would likely confuse or associate the two." Checkpoint, 269 F.3d at 281 (internal citations omitted).

The Parties in this case disagree on whether the products, pork and seafood, are competitors in the marketplace. It is settled law that goods need not be identical to support finding of competing products and a likelihood of confusion. See Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 723 (3d Cir. 2004). See In re Pan-O-Gold Baking Co., 20 U.S.P.Q.2d 1761 (TTAB 1991) (determining muffin mix and freshly baked bread to be competitive as both are for mealtime consumption); In re Vroman Foods, Inc., 224 U.S.P.Q. 242, 243-44 (TTAB 1984) (determining chewing gum and ice cream bars to have a "common status" as a treat, confection or snack food). There are a number of variables to be considered to determine if products compete in the marketplace. Because seafood and pork are arguably competitive, the degree of similarity required to prove a likelihood of confusion is diminished as compared to goods that are

12

not competitive. See Kos Pharms., 369 F.3d at 713.

### *Similarity of the Marks*

The registered mark and the challenged mark in this case, as illustrated above, have the identical BLACK PEARL wording. However, the design mark is wholly unique between the two. Martin's BLACK PEARL mark is a black and white mark with a drawing of a black pearl followed by the words "Black Pearl" in script flowing in a wave-like style intended to be suggestive of seafood. [IMB's Response to Concise Statement of Material Facts at ECF No.74]. IMB's Design Mark has three dominant components, a fair ribbon with five stars, a prize hog and the words "BLACK PEARL PREMIUM" written in block lettering. [Id.] The IMB Design Mark is comprised of the colors red, blue, white and black.

"Where the names are identical . . . the names in themselves are evidence of likelihood of confusion." American Plan Corp. v. State Loan & Finance Corp., 365 F.2d 635, 639 (3d Cr. 1966). It is certainly true that the design marks between the two trademarks are distinct. The overall impression of the two marks, one black and white and using script for the name and one in color using block letters for the name, is not one in which they are related. However, Martin provided evidence that the name BLACK PEARL is used without the design mark to identify BLACK PEARL pork in certain contexts such as menu items in restaurants and on IMB's online ordering form. Furthermore, Martin not only holds a registered trademark for the BLACK PEARL design mark, but it also holds the registered trademark for the BLACK PEARL name in standard characters. The name BLACK PEARL is the prominent identifier in each design mark. The law is clear that where a composite mark consists of words and design elements, the words typically constitute the dominant portion of the mark and are accorded greater weight. See

Herbko Int'l, Inc. v. Kappa Books, Inc., 308 F.3d 1156, 1165 (Fed. Cir. 2002). "Moreover, in a composite mark comprising a design and words, the verbal portion of the mark is the one most likely to indicate the origin of the goods to which it is affixed." CBS, Inc. v. George Clifford Morrow, 708 F.2d 1579, 1581-82 (Fed. Cir. 1983). "When the dominant portions of the two marks are the same, confusion is likely." Country Floors, Inc. v. Gepner, 930 F.2d 1056 (3d Cir. 1991).

Martin also provides evidence that the name BLACK PEARL is used on restaurant menus to describe its seafood. Because consumers often see the BLACK PEARL mark without any logo and order the goods that way, the proper comparison is to the mark in standard characters. See Sabinsa, 609 F.3d at 184 (in reversing summary judgment for the defendant and ordering judgment as a matter of law for the plaintiff senior user, the Third Circuit held that the district court committed clear error by focusing on the products' logos "*while ignoring evidence that both marks are often used in plain text without the surrounding graphics*.")(emphasis added). Because the case law provides support that the text portion of the logos is the primary portion and because of the consistent use of the name BLACK PEARL without the design mark, we find that there would be likelihood of confusion and this Lapp Factor weighs in favor of Martin.

### 2.     The Strength of Martin's Mark

Courts have recognized that

> "[a] strong trademark is ... one that carries widespread, immediate recognition that one producer (even if unknown) is associated with the mark, and so with the product. If a second comer adopts a mark substantially identical to a strong mark, there is a correspondingly high likelihood that consumers will mistakenly associate the newcomer's product with the owner of the strong mark."

Checkpoint, 269 F.3d at 282 (quoting Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd.,

50 F.3d 189, 203 (3d Cir. 1995)).

"'The strength of a mark is determined by (1) the distinctiveness or conceptual strength of the mark and (2) its commercial strength or 'marketplace recognition.' The first prong of this test looks to the inherent features of the mark; the second looks to factual evidence of 'marketplace recognition.'"

BabyAge.com, Inc v. Leachco, Inc., 2009 WL 82552 at *9 (citations omitted).

The Lapp case stated that if the trademark owner and alleged infringer deal in competing goods, the court will determine whether the mark is inherently distinctive or has acquired sufficient, secondary meaning to make it distinctive, and compare it against the challenged mark. See Fisons, 30 F.3d at 462.

The name BLACK PEARL suggests something rare or special [Martin Internal Corporation's Memorandum in Support of its Motion for Summary Judgment at ECF No.55]. Martin asserts that its BLACK PEARL seafood mark is inherently distinctive and conceptually strong as either a "suggestive" mark or an "arbitrary" mark. "Arbitrary or fanciful marks use terms that neither describe nor suggest anything about the project." Sabinsa, 609 F.3d at 185. "Suggestive marks require consumer imagination, thought, or perception to determine what the product is." Id. (internal quotes omitted) [Martin International Corporation's Memorandum in Support of its Motion for Summary Judgment at ECF No.55.] BLACK PEARL may be viewed as "suggestive" because black pearls come from oysters, which are found in the ocean, and thus the mark may suggest that oysters or another type of seafood is being offered for sale. Alternatively, Martin's BLACK PEARL mark may be considered "arbitrary" by someone unfamiliar with the origin of pearls because, in that case, the mark would suggest nothing about Martin's seafood. [Id.] In either scenario, Martin asserts BLACK PEARL is a distinctive mark

known in the industry. To prove this, Martin calls on the extensive advertising it does in the market. It presented testimony of a seafood buyer who recognized the Martin BLACK PEARL name, and it presented letters from end consumers who laud BLACK PEARL products. [Id.] Martin asserts that its BLACK PEARL mark is distinctive and presumed to be strong because of its uncontested registration for the mark. See Cadbury Beverages v. Cott Corp., 73 F.2d 474 (2d Cir. 1996).

IMB claims the BLACK PEARL mark is not distinctive because of the use of identical word marks in the food industry and in food-related industries. [IMB's Memorandum in Opposition to Motion for Summary Judgment at ECF No.73]. IMB cites to other current uses of the name BLACK PEARL for other foods and existing restaurants in the United States. IMB claims the term BLACK PEARL is used throughout the food industry. [IMB's Response to Concise Statement of Material Facts ECF No.74.] IMB states that there are no less than eleven restaurants throughout the United States that use the name BLACK PEARL to advertise their restaurant and/or the food they serve. [Id.] These restaurants advertise seafood on their menus and have dishes that carry the BLACK PEARL name. [Id.] With regard to the use of BLACK PEARL related to other grocery items, IMB asserts there are seven registered marks that use the words "BLACK PEARL" to advertise food products. [Id.] Those products include coffee, wine, chocolates, nutritional supplements, and olives. IMB has also seen the name BLACK PEARL associated with rice and salmon caviar. [Id.] Finally, there is a BLACK PEARL award for food quality and safety by the International Association for Food Protection. All of these BLACK PEARL uses cause the name BLACK PEARL not to be distinctive in Martin's use.

IMB calls upon Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252 (5th Cir. 1980), in

which the plaintiff Domino Sugar sought to prevent Domino's Pizza from using the DOMINO

mark. The court ruled against the injunction stating that while DOMINO mark was very strong

with regard to sugar, it was weak outside of that limited context. Id. at 259-60. The weakness

was attributed to evidence of 15 third-party uses of the mark DOMINO. The court observed that,

"The greater the number of identical or more or less similar trade-marks already in use on

different kinds of goods, the less is the likelihood of confusion." Id. IMB states that Martin's

mark may be strong in the way of seafood products, but the BLACK PEARL name is used in a

variety of ways in the food industry causing it not to be a distinctive mark overall. [IMB's

Memorandum in Opposition to Motion for Summary Judgment at ECF No.73].

Martin counters by stating that its BLACK PEARL use for seafood products is exclusive

and that there is no other use or registration by a third party. Martin does admit to the uses of

BLACK PEARL as described by IMB. [Martin International Corporation's Memorandum in

Support of its Motion for Summary Judgment at ECF No.55]. But because the other uses are not

closely related to seafood, they do not dilute the presumptive strength of Martin's BLACK

PEARL mark. [Id.] Further, Martin states the law does not require a trademark holder to act

against every infringing use no matter how inconsequential. See J. Thomas McCarthy, McCarthy

on Trademarks and Unfair Competition, 4th Ed. § 11:9. Martin provides evidence of its defense

of the BLACK PEARL trademark with regard to what it considers competitive products. [Martin

International Corporation's Memorandum in Support of its Motion for Summary Judgment at

ECF No.55]. Martin counters IMB's assertions that the other uses of BLACK PEARL dilute its

strength by saying the other uses are unrelated. It is not readily apparent to this Court that

Martin's BLACK PEARL mark is distinctive in the food industry under the designation of

"distinct" in the case law. Based on the evidence provided by both Parties we are not convinced that a typical consumer would recognize Martin's BLACK PEARL trademark as one related to its seafood. While the other uses may not be center-of-the-plate items, we disagree that they are unrelated. In the case of restaurants using BLACK PEARL on their menus to describe dishes that do not contain Martin's BLACK PEARL seafood, we think it pertinent to distinctiveness, especially when at times BLACK PEARL is used to describe Martin's seafood at restaurants. We do not find a few anecdotal occurrences of recognition to be dispositive of Martin's BLACK PEARL's strength in the market place. Further, while the design of Martin's BLACK PEARL logo may be unique, the prevalent use of the text BLACK PEARL (which we determined to be the more important factor of the design mark) causes it to not be distinct in the marketplace. Therefore, we do not think the distinctiveness or strength of the mark weighs in favor of Martin.

### 3.    Factors Indicative of the Care and Attention Expected of Consumers when Making a Purchase.

IMB emphasizes in its pleadings that the way in which it performs its targeted marketing aims at soliciting sophisticated buyers and as a result its customer-base is sophisticated clientele. Courts generally do not find Lanham Act violations in circumstances where a consumer is more likely to exercise heightened care before making a purchase. See Checkpoint, 269 F.3d at 285. Checkpoint further goes on to state, "[I]t is assumed that . . . professional buyers are less likely to be confused than the ordinary consumer." Id. As described above, IMB sells their pork to food markets and grocery stores, restaurants, bars, taverns, pubs, saloons, pizza places, medical centers, nursing homes, retirement homes, country clubs, colleges, high schools, day schools, child care centers, summer camps, career centers, vocational and technical schools, organizations

and clubs, The Salvation Army, college fraternities and sororities, churches, businesses, museums, convention centers, and gentlemen's clubs. [Martin International Corporation's Statement of Material Facts in Support of Its Motion for Summary Judgments at ECF No.56]. IMB also sells its BLACK PEARL pork to individuals related to the company. [Id.]

Customers may order BLACK PEARL branded pork from IMB Defendants in the following ways: (1) by placing an order with a sales representative in person; (2) by placing an order over the telephone; and (3) by placing an order electronically on their computer using a password protected site on the Internet or using proprietary software that is installed on the customers' computer systems. [Id.] IMB points out the significance of the fact that a purchase is not made without contact with a personal representative of IMB, unless the customer is an established, long-standing customer. IMB also points out that they only sell to individuals who would be in charge of purchasing food as part of their job and thus would be a sophisticated buyer. [IMB's Memorandum in Opposition to Motion for Summary Judgment at ECF No.73].

In opposition to this position, Martin cites J&B Wholesale Distrib., Inc. v. Redux Bevs., LLC, 621 F.Supp.2d 678 (D. Minn. 2007) for support where the court holds that consumers of food generally are not sophisticated, and thus all the more likely to be confused by similar marks. Id. at 687. This general lack of sophistication holds true not only for end consumers of food, but also for institutional food buyers. See In re Pierce Foods Corp., 230 U.S.P.Q 307 (TTAB 1986). Martin further states that the Parties' respective seafood and pork is not set at a high price point; and a lower price for a product indicates a lesser degree of care in making purchases. (citing Frank Brunkhorst, 875 F. Supp. 966, 983 (U.S. E.D. N.Y. 1994); In re Martin's Famous Pastry Shoppe, Inc., 748 F.2d 1565, 1567 (Fed. Cir. 1984); Kemp v. Bumble Bee Seafoods, Inc., 398

19

F.3d 1049 (8th Cir. 2005). Furthermore, the Lanham Act covers not just purchasers of the product but also end-users of the product. So IMB's wide range of consumers, including those whose primary business is not food such as childcare centers and churches, would fall under this law. [Martin International Corporation's Memorandum in Support of its Motion for Summary Judgment at ECF No.55]. Where products are sold to a range of consumers, some of whom are sophisticated and some of whom are not, likelihood of confusion is evaluated from the perspective of the least sophisticated among them. See Sabinsa, 609 F.3d at 186.

While we understand that some of the food purchasers may be sophisticated based on their experience in their working positions, we follow the presumption that generally speaking purchasers of food would not be sophisticated as would purchasers of high end software such as in Checkpoint. Further, given the diversity of the end-user of the product, both with Martin's customers and IMB's customers, we agree with Martin that this Lapp factor weighs in favor of there being a likelihood of confusion.

4.     **The Length of Time IMB has Used the Mark without Evidence of Actual Confusion.**

IMB Parties began using the IMB Marks in August of 2006. IMB claims that in a four year period of time they sold more than $2,000,000 worth of products under the BLACK PEARL mark and there was not a single instance of actual confusion. [IMB's Memorandum in Opposition to Motion for Summary Judgment at ECF No.73]. Martin asserts that evidence of actual confusion is difficult to find and may be unlikely to be reported. IMB counters that Martin provided evidence of consumer communication when consumers lauded the quality of their seafood, so that consumer contact may not be as unlikely as Martin indicates. [Id.] "[N]o

evidence of confusion for over a three-year period, during which substantial sales occurred, is a strong indicator that the likelihood of confusion is minimal." Plus Products v. Plus Discount Foods, Inc., 722 F.2d 999, 1006 (2d Cir. 1983). Given the amount of time the challenged mark has been in use and with no evidence of actual confusion, this Lapp factor weighs in favor of the IMB Parties, though this factor is not entirely persuasive.

### 5.    The Intent of IMB in Adopting the Mark.

Martin obtained its registration for the design mark in 1999 and for the word mark BLACK PEARL in standard characters in 2001. The Parties do not dispute that IMB did not perform any due diligence in researching the BLACK PEARL mark before instituting its use in the marketplace for its pork products. [Martin International Corporation's Statement of Material Facts in Support of its Motion for Summary Judgment ECF No.56]. IMB Parties began using the BLACK PEARL marks in August 2006. IMB's use began shortly after it purchased BLACK PEARL seafood from Martin in the summer of 2006. [Martin International Corporation's Memorandum in Support of its Motion for Summary Judgment ECF No.55]. Martin asserts bad faith on the part of IMB due to the timing of the use of the mark. Further, "[E]vidence of a defendant's carelessness in evaluating the potential confusion caused by its mark with that of a senior user is highly relevant and will tend to favor a finding of likelihood of confusion." Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc., 511 F. Supp. 2d 482, 501 (E.D. Pa. 2007).

IMB, on the other hand, states there is absolutely no evidence that the IMB Parties had bad intent in adopting the IMB Marks. [IMB's Memorandum in Opposition to Motion for Summary Judgment ECF No.73]. "[A] defendant's intent will indicate a likelihood of confusion only if an intent to confuse consumers is demonstrated via purposeful manipulation of the junior

21

mark to resemble the senior's." A & H Sportswear, 237 F.3d at 226. As reviewed above, the design portion of the marks do not resemble one another but the word feature of the mark is virtually identical. IMB uses the fact that the design marks are wholly different to support its assertion that it had no bad motive nor did it design the mark to confuse consumers. Martin counters by saying that IMB was at a minimum reckless in adopting the BLACK PEARL trademark, and possibly willful in its use of the BLACK PEARL trademark. [Martin International Corporation's Memorandum in Support of its Motion for Summary Judgment ECF No.55].

Based on the timing of the use of BLACK PEARL by IMB and the identical wording, which is a major part of the design mark it is the Court's opinion that IMB intended to confuse consumers. The Court acknowledges that the design marks vary greatly but still finds this Lapp factor in favor of Martin.

### 6. The Evidence of Actual Confusion.

"If a defendant's product has been sold for an appreciable period of time without evidence of actual confusion, one can infer that continued marketing will not lead to consumer confusion in the future." Versa Prods. Co., Inc. v. Bifold Co. (mfg.) Ltd., 50 F.3d 189, 205 (3d Cir. 1995). There is no evidence in this case of any actual confusion by consumers. Actual confusion would obviously weigh heavily in favor of our granting Martin's Motion for Summary Judgment. However, actual confusion is not required to come to a determination of there being a likelihood of confusion between the Parties' marks. The lack of actual confusion by consumers in this case nonetheless weighs in favor of denying Martin's Motion for Summary Judgment.

7.    **Whether the Goods, Though not Competing, are Marketed through the same Channels of Trade and Advertised Through the Same Media**

"Under this prong, courts examine whether buyers and users of each parties' goods are likely to encounter the goods of the other, creating an assumption of common source affiliation or sponsorship. The test is whether the goods are similar enough that a customer would assume they were offered by the same source." Checkpoint, 269 F.3d at 286 (citing Fisons, 30 F.3d at 481; Wynn Oil Co. v. Thomas, 839 F.2d 1183, 1187 (6th Cir. 1988)).

Martin sells its BLACK PEARL seafood products to locations throughout the United States including establishments such as food markets and grocery stores, food distributors, restaurants, and other institutions that serve food. [Martin International Corporation's Statement of Material Facts in Support of its Motion for Summary Judgment at ECF No.56]. IMB's customers include food markets and grocery stores, restaurants, bars, taverns, pubs, saloons, pizza places, medical centers, nursing homes, and retirement homes, country clubs, colleges, high schools, and day schools, child care centers, summer camps for children, career centers, vocational/technical schools, organizations and clubs, The Salvation Army, college fraternities and sororities, churches, businesses, museums, convention centers and gentlemen's clubs. [Id.] There is no doubt that there was crossover between specific buyers of Martin's seafood and specific buyers of IMB's pork  when there is evidence that IMB defendants bought BLACK PEARL seafood from Martin and resold it. [Id.] In Martin's Statement of Material Facts, it cited to the deposition of Scott Kern, General Counsel and an owner of the IMB Defendant's, where he admitted that seven establishments serving food purchased both Martin's BLACK PEARL branded seafood and also bought IMB Defendant's BLACK PEARL branded pork. [Id.] In

response to the fact that there was a direct overlap when IMB Defendants purchased Martin

seafood and resold it, IMB claims the sales were during a limited time period (between May and

October 2006), for a limited amount (41 purchases), and the vast majority of the product from

Martin was used by the IMB parties in prepared and/or repackaged products that were sold

without any indication of their origin. [Id.] There were a total of 13 sales of the Martin product

to IMB customers in Martin's original packaging. [Id.] We also note there is general crossover

in the fact that both Parties deal with goods in the food industry. In particular, we note that both

Parties sell to grocery stores or markets and restaurants, as well as the fact that there is also

overlap where both companies attend food shows and have websites to promote their goods.

With regard to advertising, IMB uses direct marketing to customers, while Martin

engages in the more traditional print and media advertising. [IMB's Memorandum in Opposition

to Motion for Summary Judgment ECF No.73]. While the advertising styles differ between the

companies, the secondary result is similar in that the BLACK PEARL name reaches consumers,

sometimes in only text form, where the end result can be a likelihood of confusion. IMB asserts

this is only limited overlap, but nonetheless it does not obviate the likelihood of confusion that

can occur in that overlap. IMB in its Concise Statement of Material Facts [Id. ECF No.74],

emphasizes that it only sells to institutional customers such as restaurants, professional food

service providers, hospitals, nursing home, and other entities that sell or provide prepared foods

as part of their business. IMB does not market to individuals, nor do they sell to any large

supermarkets or traditional grocery stores. [Id.] IMB also rebuts Martin's assertions that both

parties market to grocery stores by IMB, discussing each specific customer's business and

explaining why IMB's customer grocery stores are not the typical grocery store to which Martin

markets, such as Whole Foods. Rather IMB sells to small businesses that cater to individuals seeking restaurant quality foods that can be taken off-site. [Id.] These small business grocery stores make up less than 1.67% of IMB's business. [Id.] IMB asserts that because of the nature of their customer base, they only sell to professional food purchasing personnel who would not likely confuse the BLACK PEARL trademark of Martin with the BLACK PEARL trademark of IMB. [Id.] These customers are approached directly by sales people. [Id.] Any customers not dealing directly with an IMB salesperson and using the IMB online ordering system are existing long-time customers of IMB. [Id.] IMB further states that these categories of customers make up not less than 98% of its sales. [Id.] Martin's sales are predominantly grocery stores making up 70% of its sales. [Id.] Distributors make up 25%, and restaurants make up the final 5%. [Id.] Therefore, the majority of sales do not overlap between parties. Further, IMB asserts that none of those customers ever reported confusion of the origin of the products. [Id.]

It is this Court's opinion that the customer overlap is great enough to cause confusion by the consumer as to the origin of the food products. IMB's attempt to reduce the overlap to small percentages in past sales is neither convincing of the fact that the parties do not compete, nor is it indicative of whether the overlap that may occur in the future, especially if the paths of commerce crossed so closely so as one party sold to another. This factor is weighed in favor of Martin.

### 8. The Extent to Which the Targets of the Parties' Sales Efforts are the Same

This Lapp factor goes hand-in-hand with Lapp factor seven, above. While IMB would assert it targets its advertising towards institutions and Martin targets its advertising towards grocery stores and restaurants, and there is only limited overlap, there remains clear and decisive

25

evidence that there is overlap in the food industry and thus there can be likelihood of confusion for end-user consumers. This factor also weights in favor of Martin.

## 9. The Relationship of the Goods in the Minds of Consumers because of the Similarity of Functions

Martin states Lapp factor 9 "focuses on the nature of the products themselves, asking whether it would be reasonable for consumers to associate them or see them as related." Kos Pharms., 369 F.3d at 723. Further, Martin cites that it is settled law that the goods need not be identical to support finding a likelihood of confusion. See id. Rather, courts examine "whether buyers and users of each parties' goods are likely to encounter the goods of the other, creating an assumption of common source[,] affiliation, or sponsorship." Id. (citing Checkpoint, 269 F.3d at 286). Finally, where the marks are identical, a lesser degree of product similarity is required to support a finding of likelihood of confusion. See In re Shell Oil Co., 992 F.2d 104 (Fed. Cir. 1993). Martin, in its Memorandum in Support of its Motion for Summary Judgment, provides a series of cases where courts have found products related when they are competitive, complementary, or have a common status such as a treat or confection. [ECF No.55]. In addition, Martin provided evidence of decisions by the Trademark Trial and Appeal Board (TTAB) where it was determined confusion was likely where the same mark applied to fresh meat and canned fish. [Id.] (citing Strohmeyer & Arpe Co. v. The E. Kahn's Sons Co., 98 U.S. P.Q. 83 (USPTO 1953)). Martin makes several factual arguments as well stating that pork and seafood are competitive because they are usually main feature of a meal, they are classified together by several agencies, they are substitutable in recipes, and they are found in close proximity to one another in grocery stores and market circulars. [Id.]

IMB simply states that Martin did not present any evidence that pork and seafood are linked in the minds of consumers but offers no legal or factual evidence to refute Martin's claims. [IMB's Memorandum in Opposition to Motion for Summary Judgment ECF No.73]. It has been discussed that actual evidence of consumer confusion or perspective is difficult to judge or obtain. Further, courts have determined that while consumer perspective is weighed in as a factor, it alone is not definitive and must be considered in light of all the factors. Here we must take the same approach. Martin's supporting evidence of how consumers' and courts perceive the relationship between pork and seafood is persuasive and stands uncontested. The Court finds there is likelihood of confusion, at least as to origin, when considering the relationship between pork and seafood.

10. **Other Facts Suggesting that the Consuming Public Might expect the Prior Owner to Manufacture a Product in the Defendant's Market or that It is Likely to Expand into that Market.**

Martin offers one more point in support of its position that there is likelihood of confusion for consumers encountering Martin's BLACK PEARL trademark and IMB's BLACK PEARL trademark. Martin states that there are thirty-one (31) food processors and distributors owning sixty-three (63) trademarks registered in the Patent and Trademark Office, which cover both seafood and pork. [Martin International Corporation's Memorandum in Support of Motion for Summary Judgment ECF No.55]. This fact establishes that it is common in the marketplace for consumers to see one unique trademark used for both seafood and meat products, including pork. We agree that this occurrence in the marketplace would cause consumer confusion on the origin of the BLACK PEARL mark.

27

## C. Summary of Lapp Factor Analysis

Reviewing the evidence of record in light of the Lapp factors, in favor of Martin's position that there is a likelihood of confusion between Martin's BLACK PEARL mark and IMB's BLACK PEARL mark are Lapp factors: 1. (perhaps the most important) where we found that the identical wording of the marks provides a sufficient degree of similarity so as to cause a consumer confusion as to their origin; 3. that consumers in the food industry are not all career experts, nor will the purchase of modestly priced foods cause a purchaser or consumer to take special care of the origin of the food; thus, there is a likelihood of confusion for consumers as to the origin of the food; 5. the intent of IMB adopting the mark was at a minimum reckless because no due diligence was performed. Further, the timing of IMB's adoption of the mark suggests bad faith; 7. definitive evidence was presented by Martin of crossing channels of marketing which was undisputed by IMB. Though advertising was not as directly opposing the end result of the advertising was likely to cause confusion; 8. the parties' sales targets are the same in the fact that they are all food industry customers; and 9. the relationship of the goods pork and seafood in the minds of consumers cannot be proven, however, Martin presented evidence that consumers could easily group these two proteins together, thus, causing likelihood of confusion. Further supporting this was Martin's Lapp factor 10. which provided evidence of several companies in the food industry that use the same trademark to market fish and meat products.

Reviewing the Lapp factors in favor of IMB, the following evidence supports IMB's position that there is not a likelihood of confusion between the Parties' marks: 2. we did not determine that Martin's BLACK PEARL mark was distinctive enough to weigh the factor in favor of confusion because there was no evidence, beyond anecdotal evidence, to prove its

strength in industry, further, IMB cited to several unrelated uses of the name BLACK PEARL which dilutes any distinctive nature of the mark; and items 4. and 6. which relate to evidence of actual confusion of consumers in the time that IMB has been using the BLACK PEARL mark. At the time of this motion both BLACK PEARL marks were being used by the parties and there were no reported incidences of actual confusion. We note that evidence of actual confusion is not readily available and while both of these Lapp factors weigh in favor of the IMB parties, the weight given to these factors is not great.

After balancing the Lapp factors against each other in a qualitative inquiry, we find that the evidence of record is one-sided in favor of Martin and as a matter of law we find there is a likelihood of confusion between the Parties' products. As such, Martin's Motion for Summary Judgment will be granted with respect to Count I of its Counterclaim against Plaintiff, International Market Brands and on Count I of its Third-Party Complaint against C.A. Curtze, Inc., Jacobstein Food Service, Inc., and Northern Frozen Foods, Inc. d/b/a Northern Haserot.

**IV. Conclusion.**

Because there are genuine disputes as to material facts, Defendant's Motion for Summary Judgment will be granted with regard to Count I of Martin's Counterclaim against IMB for federal trademark infringement.

An appropriate Order follows.

October 24, 2012

Maurice B. Cohill, Jr.
Senior District Court Judge